Glen C. MARDIS, et al., Plaintiffs,

v.

BIG NANCE CREEK WATER MANAGE-
MENT DISTRICT; Lawrence County
Soil and Water Conservation District;
Lawrence County Commission; Clyde
Cameron, Oklie Lanier, Jerry Graham,
Rayburn Beck and Rayburn Pierce, in-
dividually and in their capacities as
members of the Lawrence County Com-
mission; Town Council of Courtland,
Alabama, a municipal corporation;
D.L. Martin, Jr., J.A. Lovelady, Jr. and
H.A. Pippen, Jr., individually and in
their capacities as commissioners of
Big Nance Creek Water Management
District [State Defendants],

and

John Block, Secretary of Agriculture of
the United States Government
[Federal Defendant].

No. 82–HM–5324–NE.

United States District Court,
N.D. Alabama,
Northeastern Division.

Dec. 2, 1983.

John L. Sims, Hartselle, Ala., for plaintiffs.

D.L. Martin, Moulton, Ala., for all defendants except John Block, Sec. of Agr.

Frank S. James, III, Asst. U.S. Atty., Birmingham, Ala., for defendant John Block, Secretary of Agr.

## MEMORANDUM OPINION

HALTOM, District Judge.

Plaintiffs, owners of land within the Big Nance Creek Water Management District in Lawrence County, Alabama, brought this action to enjoin the federal and state defendants from proceeding with the construction of proposed floodwater retarding structure Site No. 4 to be located on Crooked Creek in the Loosier Community within the Big Nance Creek Watershed. Plaintiffs allege that the failure of the Soil Conservation Service, United States Department of Agriculture, to prepare an environmental impact statement for the Big Nance Creek Watershed Project violates the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq. Plaintiffs further claim that the 1980 cost-benefit analysis for the Big Nance Creek Watershed Project is invalid and illegal because of the alleged failure of the Soil Conservation Service to employ a realistic current interest and discount rate in its 1980 determination that the benefits of the Project exceeded the costs.

Plaintiffs' Motion for Preliminary Injunction, by order of the Court and with the consent of the parties, was consolidated with the trial on the merits and heard by the Court March 29 through April 1, and April 25, 1983. Proposed findings of fact and conclusions of law requested by the Court were submitted by counsel for the parties herein on June 2, 1983.

Jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 1391; 5 U.S.C. §§ 551 et seq. and 701 et seq.; 16 U.S.C. § 1003; and 42 U.S.C. §§ 4321 et seq.

As authorized by Rule 52(a), the Court, in this memorandum opinion, incorporates its findings of fact and its conclusions of law. Rule 52(a), Fed.R.Civ.P.

## FINDINGS OF FACT

1. Big Nance Creek lies in the north central portion of Lawrence County, Alabama. It flows north and empties into Wilson Lake on the Tennessee River. The Big Nance Creek Watershed has an area of 118,925 acres in Lawrence County, Alabama. Approximately 12,291 acres of land in the Big Nance Creek Watershed are subject to flood damage. The flood plain is continuous. Damaging floods occur an average of six times annually. On average, two or three of these floods occur during the growing and harvesting seasons. The flooding results in soil erosion, sediment buildup, and crop damage. Flooding formerly affected the underground water supply of the Town of Moulton, Alabama, the county seat of Lawrence County, Alabama, which is situated near the southern end of the Watershed. Flooding still causes substantial recurring annual damage in the Town of Courtland, Alabama, which is in the northern end of the Watershed. The crooked and clogged channel of Big Nance Creek and its tributaries causes siltation, scouring and flooding in the flood plain. Crooked Creek is within the Watershed and is a tributary of Big Nance Creek.

2. The Big Nance Creek Watershed Project was first proposed in late December, 1958 under Public Law 83–566, as amended (16 U.S.C. §§ 1001–1009), the Watershed Protection and Flood Prevention Act, by the Lawrence County, Alabama Board of Revenue (now Lawrence County Commission), the Town Council of the Town of Moulton, Alabama, the Town Council of the Town of Courtland, Alabama, the Northwest Alabama Soil Con-

servation District, and the Big Nance Creek Watershed Conservancy District,[1] through written application to the State Soil Conservation Committee of Alabama asking the United States Department of Agriculture to provide planning assistance under the Watershed Protection and Flood Prevention Act in developing a work plan for the Big Nance Creek Watershed. Under date of April 10, 1959 the State Soil Conservation Committee of Alabama gave its written approval for such project for federal assistance under the Watershed Protection and Flood Prevention Act (Department of Agriculture Exhibit # 17).

3. At all times herein pertinent the responsibility for administration of the Watershed Protection and Flood Prevention Act, as amended, has been assigned by the Secretary of the United States Department of Agriculture to the Soil Conservation Service.

4. Subsequent to the filing of the application referred to in Finding of Fact # 2 above, there was developed through the cooperative efforts of the local applicants and the Soil Conservation Service a mutually satisfactory plan for works of improvement for the Big Nance Creek Watershed which was reduced to writing in the form of Watershed Work Plan Agreement between the Lawrence County, Alabama Board of Revenue (now Lawrence County Commission), the Town Council of the Town of Moulton, Alabama, the Town Council of the Town of Courtland, Alabama, the Lawrence County Soil and Water Conservation District, and the Big Nance Creek Watershed Conservancy District (sponsoring local organizations) and the Soil Conservation Service of the United States Department of Agriculture. By the terms of such agreement the sponsoring local organizations committed to pay the required non-federal share of the cost of the Big Nance Creek Watershed Project and to acquire without cost to the federal government such lands, easements or rights of way needed in connection with the works of improvement.[2] Representatives of the five sponsoring local organizations signed the original Watershed Work Plan Agreement in January and February, 1963, pursuant to previously adopted authorizing resolutions. On April 11, 1963 the Soil Conservation Service of the United States Department of Agriculture executed such original Watershed Work Plan Agreement by and through its Acting Administrator (Department of Agriculture Exhibit # 18).

5. The original Watershed Work Plan for the Big Nance Creek Watershed Project, Lawrence County, Alabama, referred to in Finding of Fact # 4 above, provided for structural measures consisting of nine floodwater retarding structures at various locations within the Big Nance Creek Watershed, a municipal water supply reservoir for the Town of Moulton, and about 60 miles of channel work. Proposed floodwater retarding structure Site No. 4 on Crooked Creek in the Loosier Community in Lawrence County, Alabama, which is the principal subject of the within litigation, is but one of the planned works of improvement in the Big Nance Creek Watershed.

6. A typical watershed floodwater retarding structure consists of an earthfill

---

1. The Big Nance Creek Watershed Conservancy District was presumably organized under Acts of Alabama No. 517, 1957, now codified as §§ 9–8–50 to 9–8–67, inclusive, Code of Alabama 1975.

2. Acts of Alabama No. 517, 1957, p. 705, § 10, now codified as § 9–8–61, Code of Alabama 1975, provides in pertinent part:
   "Subject to the approval of the board of supervisors, the board of directors of a watershed conservancy district shall have power to:
   (1) Acquire by purchase, gift, grant ..., or through condemnation proceedings held in the manner provided by Chapter 7 of Title 18 of this Code, such lands or rights of way as are necessary for the exercise of any authorized function of the district.
   (2) ...
   (3) Borrow such money as is necessary for the purpose of acquiring rights-of-way and establishing, constructing, repairing, enlarging and maintaining such structures and improvements as are required by the district in the performance of its functions, and issue, negotiate and sell its bonds ...."

dam with a fixed drawdown tube and an emergency spillway (Department of Agriculture Exhibit # 5). Its primary purpose is to detain runoff, allowing it to discharge through the drawdown tube at a predetermined rate. This controlled release of floodwaters will protect flood plain lands from frequent inundation. Twenty-three percent of the Big Nance Creek Watershed area which contributes to direct flooding is above the nine floodwater retarding structures. The floodwater retarding structures provide for 11,678 acre-feet of floodwater storage or the equivalent of 5.67 inches of runoff from the area above the structures, or 1.28 inches of runoff from the Watershed.

7. Land use in the Watershed is summarized as 46,552 acres of cropland, 12,077 acres of grassland, 46,222 acres of forest land, 9,133 acres in sink areas, 3,294 acres in idle land and 1,647 acres in miscellaneous use. The Plan provided that the Town of Moulton would bear the cost of the municipal water supply system and that the Soil Conservation Service would pay 100% of the construction costs of the other structural measures. The local sponsors were required to acquire—without cost to the federal government—such lands, easements or rights of way needed in connection with the works of improvement. The Plan envisioned that approximately 400 land owners—and the residents of the Town of Moulton and the Town of Courtland—in the flood plain would be benefited by installation of the planned structural measures. The cost-benefit ratio was calculated in December, 1962 by the Soil Conservation Service to be 1.3 to 1 (page 14 of Exhibit K to Department of Agriculture Exhibit # 18 and Table 6—Comparison of Benefits and Costs For Structural Measures).

8. The Watershed Work Plan for the Big Nance Creek Watershed, Lawrence County, Alabama, met the requirements of the Watershed Protection and Flood Prevention Act, as amended, by being approved by resolutions adopted on June 26, 1963, by the Committee on Public Works of the United States Senate and on October 8, 1963 by the Committee on Public Works of the House of Representatives of the United States. This action constituted authorization to provide the federal assistance specified in the approved Watershed work plan. The Soil Conservation Service of the United States Department of Agriculture was accordingly authorized to provide federal assistance in the installation of works of improvement on the Big Nance Creek Watershed substantially in accordance with the terms, conditions and stipulations contained in the Watershed Work Plan and the availability of federal funds appropriated for this purpose. (Department of Agriculture Exhibit # 20).

9. To date, approximately 15 miles of channel improvement at a PL–566 cost of $222,064, one flood retarding structure, and the municipal water supply reservoir for the Town of Moulton [3] have been completed. Further, easements and rights of way, valued at $220,127, have been obtained. With respect to progress in land treatment, the Watershed has 350 farmers and conservation plans on 367 properties. About 53 percent of all land in the Watershed is considered adequately protected, while 66 percent of the planned land treatment has been applied (page 14 of Department of Agriculture Exhibit # 27).

10. On May 23 and 24, 1966 the local sponsors through the Lawrence County Board of Revenue (now Lawrence County Commission) and the Big Nance Creek Watershed Conservancy District executed an Operation and Maintenance Agreement with the Soil Conservation Service, United States Department of Agriculture, under which they agreed to be responsible for operating and maintaining the works of improvement of the Big Nance Creek Watershed Project (when completed) therein described as floodwater retarding structures Nos. 4, 9, 10, 11, 12, 14, 15, 16 and 19 and approximately 316,800 linear feet of

---

3. Installed in 1967. The total engineering and installation costs were originally estimated at $93,000.00. The cost of this work of improvement was borne by the Town of Moulton.

channel improvement. (Department of Agriculture Exhibit #21). This document was executed on behalf of the Soil Conservation Service on June 8, 1966.

11. Under date of November 1, 1969 the defendant Big Nance Creek Water Management District was incorporated pursuant to the provisions of the "Alabama Water Management Act" (Acts of Alabama 1965, No. 685, now codified as §§ 9-9-1 to 9-9-80, inclusive, Code of Alabama 1975). (Joint Exhibit #19). Upon the establishment of such water management district, it superseded the Big Nance Creek Watershed Conservancy District (§ 9-9-51, Code of Alabama 1975) and became one of the local sponsors of the Big Nance Creek Watershed Project. Under the provisions of § 9-9-21, Code of Alabama 1975, the Big Nance Creek Water Management District has been since the date of its incorporation possessed with the power of eminent domain.[4]

12. Supplemental Watershed Work Plan No. 1 between the Big Nance Creek Water Management District, Lawrence County Soil and Water Conservation District, Lawrence County Commission, Town Council of Moulton and Town Council of Courtland (as sponsoring local organizations) and the Soil Conservation Service of the United States Department of Agriculture, which modified the Watershed Work Plan Agreement for the Big Nance Creek Watershed, Lawrence County, Alabama, was executed pursuant to authorizing resolutions by the above named parties and entities in September, 1971 (Department of Agriculture Exhibit #22) and became effective September 24, 1971.

13. Supplemental Watershed Work Plan Agreement No. 2 between Big Nance Creek Water Management District, Lawrence County Soil and Water Conservation District, Lawrence County Commission, Town Council of Moulton and Town Council of Courtland (as sponsoring local organiza-

tions) and the Soil Conservation Service of the United States Department of Agriculture, which further modified the Watershed Work Plan Agreement for the Big Nance Creek Watershed, Lawrence County, Alabama, was executed pursuant to authorizing resolutions by the above named parties and entities in late March and early April 1973 (Department of Agriculture Exhibit #23).

14. From October 11, 1963 through December 30, 1969 the Big Nance Creek Watershed Project was an on-going watershed project fully meeting the requirements of the Watershed Protection and Flood Prevention Act, as amended (16 U.S.C. §§ 1001-1009), and was authorized for construction prior to the close of the second session of the 90th Congress (October 14, 1968). During this stated period the Big Nance Creek Watershed Project continually had as its local sponsors the duly constituted and acting governing body of Lawrence County, Alabama, the duly constituted and acting governing body of the Town of Moulton, Alabama, a municipal corporation located in Lawrence County, Alabama, the duly constituted and acting governing body of the Town of Courtland, Alabama, a municipal corporation located in Lawrence County, Alabama, the Big Nance Creek Watershed Conservancy District organized and existing under Alabama statutory law and possessing the power of eminent domain (succeeded as of November 1, 1969 by the Big Nance Creek Water Management District organized and existing under Alabama statutory law and possessing the power of eminent domain), and the Lawrence County Soil and Water Conservation District.

15. The enactment of the National Environment Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* (NEPA), required the Soil Conservation Service of the United States Department of Agriculture to reevaluate the Big Nance Creek Watershed Project.

---

4. Section 9-9-21, Code of Alabama 1975, provides in pertinent part:

"The power of eminent domain is hereby conferred, and such lands, easements or rights of way within or outside the district may be condemned."

Prior to NEPA, the Soil Conservation Service focused primarily on engineering solutions to watershed problems, often at some cost to the environment. Thus, channel work—with its detrimental effect on the aquatic environment—was routinely incorporated into planned works of improvement. NEPA required the consideration of alternatives to minimize such effects. Accordingly, with respect to the Big Nance Creek Watershed Project the Soil Conservation Service in 1978 and 1979 conducted an environmental evaluation of the project in conjunction with an Interagency Biological Evaluation Team (IBET) consisting of representatives of the United States Environmental Protection Agency, the United States Department of Interior (Fish and Wildlife Service), the United States Forest Service, the Tennessee Valley Authority, the Department of the Army (Corps of Engineers) and the Department of Conservation and Natural Resources of the State of Alabama. On-site inspections of the Watershed and the nine proposed impoundment sites were conducted by IBET. Interested organizations and individuals were also asked to participate.

In response to NEPA and specific agency guidelines and regulations, the Big Nance Creek Watershed Project was thereupon reevaluated and modified to comply with current environmental policies. This reevaluation included a study and consideration of four alternatives to the original plan with the view of avoiding or minimizing environmental damage. The multi-agency team (IBET) determined that adverse impacts could be avoided by eliminating all remaining channel work and by modifying the design of the floodwater retarding structures. Alternative No. 4 (consisting of nine floodwater retarding structures and no channel work) was thereupon selected. A written environmental assessment was prepared by the Soil Conservation Service followed by environmental assessment concurrences by the various state and federal environmental agencies involved. All involved environmental agencies determined that the proposal measures would not cause significant adverse local, regional or national impacts on the environment. The basic data developed during such environmental evaluation and environmental assessment was retained and has continuously been available for public inspection, review and analysis.

16. Following the findings and determinations and modifications described in Finding of Fact # 15 above, the Soil Conservation Service prepared and issued a *Finding of No Significant Impact* with respect to the Big Nance Creek Watershed Project, as modified. This *Finding of No Significant Impact* and notice that an environmental impact statement (EIS) had not been prepared for flood prevention works in Big Nance Creek Watershed, Lawrence County, Alabama, was published in the Federal Register on February 22, 1980 and in The Moulton Advertiser, a newspaper of general circulation published in Lawrence County, Alabama, in its January 31, 1980 issue. In addition an environmental impact appraisal was prepared by the Soil Conservation Service and mailed to various federal, state and local agencies and to interested parties. In response to its notices and mailings, the Soil Conservation Service received and acted upon a few requests for additional information but received no protests, objections or suggestions that its conclusions regarding the environment impact of the project were in error. The Court specifically finds that no comments, suggestions, objections or protests were made by or on behalf of the plaintiffs or any of the plaintiffs in this litigation to any of the environmental studies, evaluations, re-evaluations, assessments, findings, determinations, modifications and environmental procedures described in Finding of Fact # 15 above or to the foregoing described *Finding of No Significant Impact* made by the Soil Conservation Service with respect to the Big Nance Creek Watershed Project, as modified.

17. The Soil Conservation Service also prepared in March, 1980 a revised cost-benefit analysis of the Big Nance Creek Watershed Project, as modified, reflecting a

cost-benefit ratio of 1.2 to 1. The pre-1969 interest rate of 3¼ percent was admittedly used (Joint Exhibit # 20).

On January 28, 1969 the Soil Conservation Service issued Watershed Memorandum 92 which provided instructions for determining interest and discount rates for all federal and federally-assisted water resource projects (Department of Agriculture Exhibit # 30). In pertinent part the Memorandum directed that watershed projects authorized for construction prior to the close of the second session of the 90th Congress (October 14, 1968) for which sponsors had—prior to December 31, 1969 —given satisfactory assurances to pay the non-federal share of project costs could use an interest and discount rate of 3¼ percent in calculating cost-benefit ratios. The Memorandum stated that "[s]ponsors are considered to have provided satisfactory assurances to pay the non-federal share of project costs when they sign the work plan agreement."

Soil Conservation Service Economics Bulletin No. 39–9–4, December 5, 1970, stated that the interest rate of 3¼ percent should be used for watershed plans approved prior to October 14, 1969 and that "[t]he approval date to be used in determining the applicable interest rate is the date the administrator or the State Conservationist signed the original plan of agreement."

18. Following the issuance and publication of the *Finding of No Significant Impact* referred to above and on May 13, 1980, the local sponsors of the Big Nance Creek Watershed Project through the Lawrence County Commission submitted application to the United States Army Corps of Engineers (Nashville District), pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344, for a permit to construct the nine earthfill, floodwater retarding structures (including Site No. 4) contemplated and proposed by the Big Nance Creek Watershed Plan, as modified. Under the Clean Water Act a permit is required to discharge dredged or fill material containing potential pollutants into the navigable waters of the United States. The permit

application procedures provide for notice to the public and opportunity for comment. Under date of May 30, 1980, the Corps of Engineers, the Tennessee Valley Authority and the State of Alabama issued written Joint Public Notice of the foregoing described application for permit (Department of Agriculture Exhibit # 8). This Joint Public Notice of May 30, 1980 reads in pertinent part as follows:

80–137

APPLICATION NO. 46,285

TO ALL CONCERNED: The application described below has been submitted for a Department of the Army Permit pursuant to Section 404 of the Clean Water Act (CWA). Before a permit can be issued, certification must be provided by the State of Alabama, Water Improvement Commission, pursuant to Section 401(a)(1) of the CWA, that applicable water quality standards will not be violated.

APPLICANT: Lawrence County Commission

Courthouse Annex
Moulton, Al. 35650

LOCATION: Various locations in the Big Nance Creek watershed in Lawrence County, Alabama. Big Nance Creek is a tributary of the Tennessee River at Mile 274.0.

DESCRIPTION: The proposed work, if approved, would consist of the construction of nine earthfill, floodwater retarding structures. These structures would be utilized in conjunction with an overall watershed protection plan. Floodwater retarding structures 4, 9 and 10 would be operated to allow fisheries management by creating permanent pools and water level control devices. Floodwater retarding structures 11, 12, 14, 15, 16, and 19 would be operated as "green tree reservoirs" or as permanent "shallow aquatic marshes." Hardwood clearing would be kept to a minimum with a buffer strip of woodland vegetation left around the pool wherever practical. Approximately 63 miles of channel improvement was planned. About five miles of channel improvement has been installed. All remaining channel construc-

tion is deleted from the watershed protection plan. The project is sponsored by the Big Nance Creek Watershed Management District, the Lawrence County Commission, the Lawrence County Soil and Water Conservation District, and the cities of Courtland and Moulton, Alabama, with technical assistance of the US Department of Agriculture, Soil Conservation Service (SCS). Plans and structure data of the proposed work are attached to this notice.

The decision whether to issue a permit will be based on an evaluation of the probable impact of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the proposal will be considered; among those are conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use, navigation, recreation, water supply, water quality, energy needs, safety, food production and, in general, the needs and welfare of the people. In addition, the evaluation of the impact of the activity on the public interest will include application of the guidelines promulgated by the Administrator, Environmental Protection Agency, under authority of Section 404(b) of the CWA (40 CFR Part 230).

An environmental assessment and findings of no significant impact have been prepared by the sponsors and are available for review in this office.

The National Register of Historic Places has been consulted and no properties listed in or eligible for the National Register are known which would be affected by the proposed work. This review constitutes the full extent of cultural resources investigations unless comment to this notice is received documenting that significant sites or properties exist which may be affected by this work, or that adequately documents that a potential exists for the location of significant sites or properties within the permit areas. Copies of this notice are being sent to the office of the State Historic Preservation Officer and the US Department of the Interior, Heritage Conservation and Recreation Service, Interagency Archeological Services-Atlanta. The proposed activity will not destroy or endanger any known critical habitat of a threatened or endangered species as identified under the Endangered Species Act, and no formal consultation procedures with the US Fish and Wildlife Service will be initiated.

Other Federal, State and local approvals required for the proposed work are as follows:

a. Tennessee Valley Authority (TVA) approval under Section 26a of the TVA Act.

b. Water quality certification from the State of Alabama in accordance with Section 401(a)(1) of the Clean Water Act.

Any person may request, in writing, within the comment period specified in this notice, that a public hearing be held to consider this application. Requests for public hearings shall state, with particularity, the reasons for holding a public hearing.

Written statements received in this office on or before 30 June 1980 will become a part of the record and will be considered in the determination. Any response to this notice should be directed to the Regulatory Functions Branch, Attention: Mr. J. Michael Jones, at the above address, telephone (615) 251–5181. It is not necessary to comment separately to TVA since copies of all comments will be sent to that agency and will become part of its record on the proposal. However, if comments are sent to TVA, they should be mailed to Director of Land and Forest Resources, Norris, Tennessee 37828.

19. Under date of January 7, 1981 the Corps of Engineers (Nashville District) issued its written *Environmental Assessment Concurrence* respecting the Big Nance Creek Watershed Project (Department of Agriculture Exhibit # 15), which reads as follows:

ENVIRONMENTAL CONCURRENCE

FILE NO: 46,285

APPLICANT: Lawrence County Commission

Courthouse Annex
Moulton, Al 35650

LOCATION: Big Nance Creek Watershed (see attached Public Notice 80–137).

DESCRIPTION: The applicant, in conjunction with several co-sponsors and the US Soil Conservation Service, proposes to construct nine floodwater retarding structures at various locations within the Big Nance Creek watershed in Lawrence County, Alabama, as described in the attached Public Notice 80–137, dated 30 May 1980 (Incl. 1).

DISCUSSION: A document entitled "Watershed Plan for Watershed Protection and Flood Prevention, Big Nance Creek Watershed," has been prepared by the applicant and the co-sponsors of the project (Incl. 6). This document includes an Environmental Assessment, Findings of No Significant Impact, and the results of an archeological survey of the project impact areas. Extensive coordination between the project sponsors, the US Fish and Wildlife Service, and the Alabama Department of Conservation and Natural Resources has occurred since inception of the work plan in 1962. A number of modifications have been incorporated into the project to minimize environmental degradation and enhance wildlife and fishery values of the watershed. These modifications are described in the attached Watershed Plan and agency comments received in response to the Public Notice (Incl. 2–4). Water Quality Certification (Incl. 5) was issued by the State of Alabama by letter dated 24 December 1980.

SECTION 404(b) EVALUATION:

a. *Physical Effects:* The physical effects of the proposed work are described in the Watershed Plan. The primary physical impacts would not be directly associated with the fill itself, but would result from the change in upstream habitat from an intermittent drainage to a temporary or permanent impoundment after the flood control structures are completed.

b. *Chemical-Biological Interactive Effects:* All earth material used for the proposed fills would be obtained from the local area and would be free from toxic substances. There are no anticipated chemical-biological interactive effects which would result directly from placement of the earth fill structures, and detailed evaluations, such as elutriate testing, is not warranted.

CONCLUSIONS: The proposed construction of the nine floodwater retarding structures should result in a net benefit to fish and wildlife values within the watershed. Some currently wooded habitat would be converted to open water or marsh habitat; however, suitable forest land is plentiful in the surrounding areas and the new habitat created will produce a more diverse ecosystem. The work, in conjunction with upland soil treatment, would provide erosion and flood protection to county landowners and public utilities. The anticipated impacts of the work are adequately addressed in the watershed work plan prepared by the applicant, and this document will be utilized in lieu of a separate environmental assessment prepared by this office. Provided the work plans and following recommended special conditions are strictly adhered to, no further evaluation is warranted.

RECOMMENDED SPECIAL CONDITIONS:

a. That all disturbed areas be properly seeded, riprapped, or otherwise stabilized to prevent erosion.

b. That if any materials or sites of cultural, historical, or archaeological significance are discovered within the project boundaries at any time preceding or during construction, the District Engineer will be immediately notified and work will be ceased until further investigations are completed to the District Engineer's satisfaction.

c. That any acreage of hardwood timber cleared for the impoundments be mitigated by the applicant obtaining an easement to

prevent clearing on an equal acreage of hardwood timber in the flood pool area.

d. The clearing line for the permanent pools at structures 4, 9, and 10 will be lowered one or two feet vertically from original project plans in stands of hardwood timber.

e. That all activities concerning fisheries management should be coordinated with state fish and game personnel.

20. Under date of January 28, 1981 the Corps of Engineers (Nashville District) issued the following findings of fact with respect to the application for permit by the Lawrence County Commission:

### FINDINGS OF FACT FOR A DEPARTMENT OF THE ARMY PERMIT APPLICATION

PUBLIC NOTICE ORNOP–F 80–137 APPLICATION NO. 46,285

On 13 May 1980, Lawrence County Commission, Courthouse Annex, Moulton, Alabama 35650, applied for a Department of the Army Permit pursuant to Section 404 of the Clean Water Act for the following work:

Construction of nine earthfill, floodwater retarding structures. These structures would be utilized in conjunction with an overall watershed protection plan. Floodwater retarding structures 4, 9, and 10 would be operated to allow fisheries management by creating permanent pools and water level control devices. Floodwater retarding structures 11, 12, 14, 15, 16, and 19 would be operated as "green tree reservoirs: or as permanent "shallow aquatic marshes." Hardwood clearing would be kept to a minimum with a buffer strip of woodland vegetation left around the pool wherever practical. Approximately 63 miles of channel improvement was planned. About five miles of channel improvement has been installed. All remaining channel construction is deleted from the watershed protection plan. The project is sponsored by the Big Nance Creek Watershed Management District, the Lawrence County Commission, the Lawrence County Soil and Water Conservation District, and the cities of Courtland and Moulton, Alabama, with technical assistance by the US Department of Agriculture, Soil Conservation Service (SCS). The work would be performed at various locations in the Big Nance Creek watershed in Lawrence County, Alabama. Big Nance Creek is a tributary of the Tennessee River at Mile 274.0

This office issued a Public Notice concerning the proposed work. Adverse comments were not received in response to the notice.

Attached is the "Environmental Assessment" prepared for the proposed work.

I have reviewed the application, response to the Public Notice and the Environmental Assessment in light of the general public interest and have determined that the proposed activity does not constitute a major Federal action significantly affecting the human environment within the meaning of the National Environmental Policy Act of 1969. Accordingly, I have concluded that an Environmental Impact Statement is not required. In addition, I have reviewed this application in accordance with the guidelines established by the Administrator of the Environmental Protection Agency in Title 40, Code of Federal Regulations, Part 230. Further, having weighed the potential benefits that may be accrued as a result of the proposed activity against the reasonably foreseeable detrimental effects, I conclude that permit issuance would be in the public interest.

FOR THE DISTRICT ENGINEER
(s) Howard Boatman
Chief, Operations Division

21. Under date of February 24, 1981, the Corps of Engineers (Nashville District) issued to the Lawrence County Commission written permit to construct the nine earthfill, floodwater retarding structures in conjunction with an overall watershed protection plan at various locations in the Big Nance Creek Watershed in Lawrence County, Alabama. Floodwater retarding structure No. 4, directly involved in the within litigation, was included in the described permit (Department of Agriculture Exhibit

# 14). The effective date of such permit is February 24, 1981. The completion date specified in such permit is February 24, 1984.

22. The procedures governing the application for permit under the Clean Water Act by the Lawrence County Commission to the Corps of Engineers (Nashville District) respecting the Big Nance Creek Watershed Project (referred to in Finding of Fact # 18 above) provide for notice to the public and opportunity to comment. The Court finds from the evidence that all appropriate federal and state agencies and members of the public (including those members of the public residing within the Big Nance Creek Watershed in Lawrence County, Alabama) were notified and advised by the Corps of Engineers (Nashville District) of the permit application of the Lawrence County Commission. Department of Agriculture Exhibit # 11 establishes conclusively that the Corps of Engineers received a number of responses and comments from various federal and state agencies regarding its public notice of the application of the Lawrence County Commission for a permit to construct the nine floodwater retarding structures in question. Of particular interest is the significant written response and comment of the United States Environmental Protection Agency, Region IV, Atlanta, Georgia, dated June 12, 1980, which reads as follows:

Colonel Robert K. Tener

District Engineer

U.S. Army Corps of Engineers, Nashville

P.O. Box 1070

Nashville, Tennessee 37202

ATTENTION: Mr. Michael Jones

SUBJECT: Lawrence County Commission (ORNOP–F 80–137)

Dear Colonel Tener:

This is in response to the above-referenced public notice dated May 30, 1980, regarding proposed construction of nine earthfill, floodwater retarding structures in conjunction with an overall watershed protection plan in the Big Nance Creek Watershed, Lawrence County, Alabama. The applicant proposes to construct and operate three of the floodwater retarding structures (FWRS 4, 9 and 10) to allow for fisheries management by creating permanent pools and water level control devices. Floodwater retarding structures 11, 12, 14, 15, 16 and 19 would be constructed and operated as "greentree reservoirs" or as permanent "shallow aquatic marshes." Approximately five miles of the originally planned 63 miles of channel improvement has been installed and the applicant has deleted all remaining channel modification from the watershed management plan. Hardwood clearing will be kept to a minimum at floodwater retarding structure sites with a buffer strip of woodland vegetation left around the pool whenever practicable.

An onsite inspection of the watershed and the nine proposed impoundment sites was conducted on June 13–15, 1979, by EPA personnel in the company of U.S. Fish and Wildlife Service, Alabama Department of Conservation and Natural Resources, and U.S. Soil Conservation Service personnel. The public notice reflects most of the inspecting agencies' recommendation concerning the environmental aspects of the work plan. With regard to the nine proposed floodwater retarding sites, EPA recommends that any acreages of hardwood timber cleared for the dams or sediment pools be mitigated by obtaining an easement on an equal acreage of hardwood timber in the flood pool area. Impoundments dates, stocking rates and other fisheries management concerns at Sites 4, 9 and 10 should be coordinated with State fish and game personnel. The clearing line for the permanent pool areas at Sites 4, 9 and 10 will be lowered one or two feet vertically in stands of hardwood timber.

If these additional project recommendations are made a part of this permit, EPA has no objections to its issuance. Thank you for providing us with this opportunity to comment on this project.

The Court further finds from the evidence that no comments or objections regarding the Lawrence County Commission permit

application was received by the Corps of Engineers or by the Tennessee Valley Authority or by the State of Alabama from or on the behalf of any of the plaintiffs in this litigation. In issuing the permit referred to the Corps of Engineers did add several special conditions as a result of the comments received in order to mitigate possible adverse environmental consequences, none of which were deemed major.

23. Plaintiff Glen C. Mardis is the lead litigator among the plaintiff group and obviously influenced the other eleven plaintiffs to join in the within litigation which was commenced on June 1, 1982, over eighteen years from the time the Big Nance Creek Watershed Project was approved for operation by the appropriate committees of both houses of Congress, over 27 months from the time the Soil Conservation Service issued its *Finding of No Significant Impact* with respect to the Big Nance Creek Watershed Project, as modified, over fifteen months from the date on which the Corps of Engineers (Nashville District) issued the permit to the Lawrence County Commission to construct the nine earthfill floodwater retarding structures contemplated by the Big Nance Creek Work Plan Agreement, as modified, and 174 days after plaintiffs Glen C. Mardis and wife, Judy C. Mardis, donated, executed and delivered to the Big Nance Creek Water Management District an easement in, over and upon 97.8 acres and 3.1 acres of their land (306 acres) situated in the Loosier Community of Lawrence County, Alabama and in the vicinity of proposed floodwater retarding structure Site No. 4 for or in connection with the construction, operation, maintenance and inspection of a floodwater retarding structure designated as Site No. 4 in the plans for Big Nance Creek Watershed, to be located on the land which is the subject of the Mardis easement (Finding of Fact # 27, infra).

24. Plaintiff Glen C. Mardis is the owner of 306 acres of land situated in the Loosier Community of Lawrence County, Alabama and in the vicinity of proposed floodwater retarding structure Site No. 4. He purchased the tract in question in 1975 which was then totally unimproved. From that time to date he has cleared and improved a substantial portion of the property, erected cross-fences, constructed his family home thereon and now operates thereon a cattle farm (100 head of registered, full-blooded cattle). Approximately 35 to 40 acres of Mr. Mardis's farm will be covered by water if Dam No. 4 is erected on its presently designated site. Mr. Mardis places a value of $1,000 per acre on his land and asserts that he will be financially and irreparably injured if the federal and state defendants are permitted to construct the floodwater retarding structure in question. Plaintiff Judy C. Mardis is the wife of plaintiff Glen C. Mardis and makes the same assertion of irreparable injury. While the home of Mr. and Mrs. Mardis may be aesthetically affected, according to their contention, by the construction of proposed floodwater retarding structure Site No. 4 and its subsequent impoundment of water, the evidence is clear that the Mardis home is situated well above the proposed water impoundment high water mark.

25. This Court is persuaded by and finds from the evidence that plaintiff Glen C. Mardis for an appreciable period of time was an ardent supporter of the Big Nance Creek Watershed Project, was fully familiar with the Project and its proposed nine floodwater retarding structures (including Site No. 4) at the time he purchased the 306 acres in question and through the time he caused improvements to be placed and constructed on his acreage from 1975 to this date. In June, 1978, Mr. Mardis agreed to serve on the governing body of the Big Nance Creek Water Management District if a certain commissioner decided not to continue serving.

Plaintiffs' Exhibit #1 (minutes of a meeting of the Big Nance Creek Water Management District held on July 12, 1977) contains the following minute entry:

Glen Mardis, landowner asked about Site #4 landownership, easements, planned construction dates, acreage of

the permanent pool, and uses of the water in the permanent pool.

Joint Exhibit # 3 (minutes of a meeting of the Big Nance Creek Water Management District held on June 13, 1978) contains the following minute entry:

Glen Mardis, landowner at Site # 4, said he was interested in getting Site # 4 build [sic] and that he would do anything he could do to get it built. He said that he had bought 360 acres in the pool area to get the structure built.

This Court believes and finds that the foregoing described minute entries speak the truth regarding the then position and stance of plaintiff Glen C. Mardis respecting the Big Nance Creek Watershed Project and particularly with respect to proposed floodwater retarding structure Site No. 4. Findings of Fact # 26 and # 27, infra, together with other evidence, persuade this Court that Glen C. Mardis's approval and support of the Big Nance Creek Watershed Project and of proposed floodwater retarding structure Site No. 4 continued at least through December 4, 1981, almost seven months before this lawsuit was filed, with Mr. Mardis as the lead plaintiff therein.

26. Under date of September 27, 1979 plaintiffs Glen C. Mardis and his wife, Judy C. Mardis, donated, executed and delivered to the Big Nance Creek Water Management District an easement in, over and upon 87.9 acres of land (particularly described) lying within the Mardis 306-acre tract previously described in Finding of Fact # 24 "for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained, and for the maintenance and inspection of areas to be flooded by floodwater retarding structure, designated as Site No. 4 in the plans for the Big Nance Creek Watershed" (Joint Exhibit # 1). This described easement was recorded in the Office of the Judge of Probate of Lawrence County, Alabama on April 1, 1980 in Deed Book 108 at pages 764–765.

27. Under date of December 4, 1981 plaintiffs Glen C. Mardis and wife, Judy C.

Mardis, donated, executed and delivered to the Big Nance Creek Water Management District an easement in, over and upon 97.8 acres of land and 3.1 acres of land (particularly described) lying within the Mardis 306-acre tract previously described in Finding of Fact # 24 "for or in connection with the construction, operation, maintenance and inspection of a floodwater retarding structure, designated as Site No. 4 in the plans for Big Nance Creek Watershed, to be located on the above described land; for the flowage of any water in, over, upon or through such structure; and for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained by such structures, and for the disposal of spoil material from the borrow area excavation" (Joint Exhibit # 2). This described easement was recorded in the Office of the Judge of Probate of Lawrence County, Alabama on December 9, 1981 and recorded in Book 112 at page 157.

While the evidence in the case does not offer an explanation regarding the two separate easements donated by Mr. and Mrs. Mardis to the Big Nance Creek Water Management District, the Court concludes that the December 4, 1981 easement was executed and donated to replace the September 27, 1979 easement.

28. Plaintiffs Reburn Heflin, Marie Heflin (wife of Reburn Heflin), Rolland Heflin (son of Reburn and Marie Heflin), Paul William Mardis (father of Glen C. Mardis), Irene Mardis (mother of Glen C. Mardis), Lou Bryant (divorced), Jewell Newton, Willard Newton (husband of Jewell Newton), James A. Bracken and Emma Jean Bracken (wife of James A. Bracken) are owners of land situated in the Loosier Community of Lawrence County, Alabama and in the vicinity of proposed floodwater retarding structure Site No. 4.

29. Under date of December 8, 1981, plaintiffs Reburn Heflin and wife, Marie Heflin, and son, Rolland Heflin, donated, executed and delivered to the Big Nance Creek Water Management District an easement in, over and upon 3.5 acres more or

less of their land (a 124½ acre tract) situated in the vicinity of proposed floodwater retarding structure Site No. 4 "for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained, and for the maintenance and inspection of areas to be flooded by floodwater regarding structure, designated as Site No. 4 in the plans for Big Nance Creek Watershed" (Joint Exhibit # 4). This easement was filed for record in the Office of the Judge of Probate of Lawrence County, Alabama on December 9, 1981 and recorded in Book 112 at page 161. For the purpose of inducing the Heflin family to execute and deliver the foregoing described easement the Big Nance Creek Water Management District committed itself to provide the Heflins with certain described related services (Joint Exhibit # 5).

30. Under date of November 18, 1981 plaintiffs James A. Bracken and wife, Emma Jean Bracken, donated, executed and delivered to the Big Nance Creek Water Management District an easement in, over and upon 34.3 acres of their land (primarily pasture land owned by them since 1967) situated in the vicinity of proposed floodwater retarding structure Site No. 4 "for and in connection with the construction, operation, maintenance, and inspection of a floodwater retarding structure, designated as Site No 4 in the plans for Big Nance Creek Watershed, to be located on the above described land; for flowage of any water in, over, upon, or through said structure; and for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained by such structure" (Joint Exhibit # 9). This easement was filed for record in the Office of the Judge of Probate of Lawrence County, Alabama on November 24, 1981 and recorded in Book 112 at page 69. These particular plaintiffs donated, executed and delivered to the Big Nance Creek Watershed Conservancy District a similar easement (but on 45 acres more or less) for the same or similar purpose on August 31, 1968 which expired according to its terms. This 1968 easement was filed for record in the Office of the Judge of Probate of Lawrence County, Alabama on September 4, 1968 and recorded in Book 84 at page 136.

31. Under date of November 7, 1979 plaintiffs Jewell Newton and her husband, Willard Newton, donated, executed and delivered to the Big Nance Creek Water Management District an easement in, over and upon 3.3 acres (more or less) of their land (a 60 acre tract) situated in the vicinity of proposed floodwater retarding structure Site No. 4 "for ... the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained, and for the maintenance and inspection of areas to be flooded by floodwater retarding structure, designated as Site No. 4 in the plans for Big Nance Creek Watershed" (Joint Exhibit # 7). This easement was filed for record in the Office of the Judge of Probate of Lawrence County, Alabama on April 1, 1980 and recorded in Book 108 at pages 744–745. Mr. Newton testified that he was in the lawsuit to help Glen Mardis.

32. Under date of October 31, 1979 plaintiff Lou Bryant (divorced) donated, executed and delivered to the Big Nance Creek Water Management District an easement in, over and upon 11.7 acres of her land (40 acres) situated in the vicinity of proposed floodwater retarding structure Site No. 4 "for ... the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained, and for the maintenance and inspection of areas to be flooded by floodwater retarding structure, designated as Site No. 4 in the plans for Big Nance Creek Watershed" (Joint Exhibit # 6). This easement was filed for record in the Office of the Judge of Probate of Lawrence County, Alabama on April 1, 1980 and recorded in Book 108 at pages 758–759.

33. Under date of December 8, 1981 plaintiff Paul W. Mardis purported to donate, execute and deliver to the Big Nance Creek Water Management District an easement in, over and upon 18.9 acres of land (55 acres of pasture land) owned by him

and his wife, plaintiff Irene Mardis, situated in the vicinity of proposed floodwater retarding structure Site No. 4 "for ... the permanent storage and temporary detention, either or both, of any waters that are impounded, stored, or detained, and for the maintenance and inspection of areas to be flooded by floodwater retarding structure, designated as Site No. 4 in the plans for Big Nance Creek Watershed" (Joint Exhibit # 8). This easement was filed for record in the Office of the Judge of Probate of Lawrence County, Alabama on December 9, 1981 and recorded in Book 112 at page 158. Plaintiff Irene Mardis did not execute the foregoing described easement and her interest in the 18.9 acres in question was subsequently obtained by condemnation proceedings instituted by the Big Nance Creek Water Management District. Plaintiffs Paul W. Mardis and Irene Mardis are the father and mother of plaintiff Glen C. Mardis.

34. All of the foregoing described easements, with the possible exception of the easement executed by plaintiffs Glen C. Mardis and wife, Judy C. Mardis, on December 4, 1981, contain the following clause:

> In the event construction on the above described works of improvement is not commenced within 120 months from the date hereof, the rights and privileges herein granted shall at once revert to and become the property of the Grantor, his heirs and assigns.

There appears to have been some modification of the above quoted clause by interlineation in the easement executed by plaintiffs Glen C. Mardis and wife, Judy C. Mardis, on December 4, 1981, but Joint Exhibit # 2 is illegible in this particular respect.

35. While the complaint and amended complaint in the above entitled civil action refer to plaintiff "Glen C. Mardis," the evidence shows his correct name to be "Glen D. Mardis."

36. Conceding that plaintiffs Glen C. Mardis and wife, Judy C. Mardis, are now vehemently opposed to the construction of proposed floodwater retaining structure Site No. 4 and its resulting impoundment of waters which will admittedly cover a portion of the land owned by Mr. and Mrs. Mardis in the Loosier Community of Lawrence County, Alabama, this Court is unable on the basis of all of the evidence presented to make a finding of fact that Mr. and Mrs. Mardis will be financially and irreparably injured if the federal and state defendants are permitted to construct the floodwater retarding structure Site No. 4 in question. The evidence shows that for a number of years Mr. Mardis obviously was of the opinion that his best interests would be served if floodwater retaining structure Site No. 4 was constructed as planned. There is much evidence in the record to support Mr. Mardis's prior opinion and very little, if any, to support his present opinion.

This Court specifically finds from the evidence that the remaining plaintiffs in this litigation were induced and encouraged by plaintiff Glen C. Mardis to participate in this lawsuit and that their principal motivation for so participating is to facially support Glen C. Mardis in his belated attempt at this late hour to bring the entire Big Nance Creek Watershed Project to a grinding halt. No evidence of irreparable injury to these remaining plaintiffs has been presented to this Court.

37. Plaintiffs offered expert testimony during the bench hearing to support their contention that the failure of the Soil Conservation Service to prepare an Environmental Impact Statement (EIS) with respect to the Big Nance Creek Watershed Project violates the National Environmental Policy Act of 1969 (NEPA). Plaintiffs' expert, Dr. Frank B. Tatom, testified (1) that there would be a possibility of anoxic layers of water flowing downstream of the proposed Site No. 4; (2) that there would be a fifty percent chance of algal bloom occurring in the reservoir of proposed Site No. 4; and (3) that an EIS should have been prepared for the Big Nance Creek Watershed Project because plaintiffs are opposed to the project. The Court finds that Dr. Tatom's first two conclusions are

based upon fallacious assumptions and that his third conclusion is unsupported by the law.

Dr. Tatom testified that anoxia (a shortage of oxygen) could occur in deep reservoirs during the summer months when lengthy and intense stratification (very sharp temperature differences between surface and lower layers of water) is most likely to occur. In Dr. Tatom's opinion, stratification would be likely to occur in relatively still bodies of water more than ten feet deep. The erroneous assumption underlying this conclusion is that the permanent pool of water at proposed Site No. 4 will be more than ten feet deep. The Court finds from the evidence that the maximum depth of the permanent pool at proposed Site No. 4 will be only 7.9 feet and the average depth only 3.7 feet. Although the water would be higher during the rainy season, it would be the same or lower during the summer months when stratification is more likely to occur. Dr. Tatom admitted that his conclusion regarding stratification would not be appropriate in water of such shallow depth.

Dr. Tatom's second conclusion was based on data he obtained from the Tennessee Valley Authority. TVA had measured the level of certain nutrients occurring at a point downstream of proposed Site No. 4. The measurements, taken in 1981 and 1982, showed high levels of nitrogen and phosphorus levels which, in the opinion of Dr. Tatom, could produce a nuisance algal bloom in the reservoir which could affect the quality of water flowing downstream. Dr. Tatom erroneously believed that TVA measured the nutrients on Crooked Creek one-half mile downstream of the proposed Site No. 4 and that the nutrients were therefore being loaded into the stream at a point upstream of the proposed reservoir. He was wrong on both counts. Dr. Neal Carriker, an employee of TVA who operated the measuring station, and Victor Paine, an SCS employee who helped to select the site of the measuring station on Crooked Creek, both testified that the measuring station was some 2½ to 3 miles downstream of the proposed site. The measuring station was located at a point on Crooked Creek downstream of the point at which Doney Brook flows into Crooked Creek. Mr. Paine, SCS's water quality expert, also testified as to several poultry operations with fecal waste lagoons flowing into Crooked Creek and Doney Brook well downstream of proposed Site No. 4. In his opinion, these lagoons could account for the high level of phosphorus and nitrogen measured by TVA. Moreover, Dr. Tatom himself admitted that the levels of phosphorous and nitrogen measured by TVA were within the limits recognized as acceptable by the Environmental Protection Agency. Further, the Court credits other evidence offered by the Defendant Secretary of Agriculture which tends to show that such nutrient levels can have beneficial effects on the environment.

With respect to his third conclusion, Dr. Tatom testified that "[I]t is generally accepted that in projects of a controversial nature [such as Site No. 4] that an environmental impact statement will be prepared." He expressed his opinion to be that plaintiffs' opposition to Site No. 4 had generated sufficient controversy to necessitate the preparation of an EIS. This conclusion is simply not in accord with the law as will be later addressed in the Court's Conclusions of Law.

38. Despite allegations of plaintiffs to the contrary, no Project Agreement (as defined by 7 C.F.R. § 651.2) has been executed between the Soil Conservation Service and the local sponsors of the Big Nance Creek Watershed Project establishing detailed working arrangements for the installation of floodwater retarding structure Site No. 4 on Crooked Creek in the Loosier Community of Lawrence County, Alabama.

## CONCLUSIONS OF LAW

In this civil action for injunctive relief plaintiffs rely on the provisions of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, *et seq.*, and on designated sections of the Watershed Pro-

tection and Flood Prevention Act, 16 U.S.C. § 1001, *et seq.*, namely §§ 1003 and 1005 thereof[5] to challenge the construction of proposed floodwater retarding structure Site No. 4 on Crooked Creek in the Loosier Community of Lawrence County, Alabama, one of the planned and congressionally authorized works of improvement of the Big Nance Creek Watershed Project.

This Court has subject matter jurisdiction of this civil action under the provisions of 28 U.S.C. § 1331 which provides: "The district court shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."

■ Plaintiffs' assertion that they are entitled to injunctive relief restraining the federal and state defendants from proceeding with the construction of proposed floodwater retarding structure Site No. 4 on Crooked Creek within the Big Nance Creek Watershed in Lawrence County, Alabama, because of the failure of the Soil Conservation Service to prepare an Environmental Impact Statement (EIS) with respect to the Big Nance Creek Watershed Project and/or with respect to proposed floodwater retarding structure Site No. 4 deserves relatively short shrift and is clearly without merit for the reasons hereinafter stated.

First, the present NEPA controversy between plaintiffs and the federal and state defendants surfaced long after the Soil Conservation Service publicly announced decision not to prepare an EIS for the Big Nance Creek Watershed Project, as modified. As noted in the Findings of Fact herein plaintiffs sat idly by during the extensive environment studies, assessments and proceedings conducted by the Soil Conservation Service with respect to the Big Nance Creek Watershed Project in conjunction and cooperation with numerous other federal agencies and with appropriate agencies of the State of Alabama and declined to avail themselves as affected landowners of the opportunity to participate in response to SCS public notices. Further, plaintiffs offered nothing but complete silence in response to the Joint Public Notice issued on May 30, 1981 by the Army Corps of Engineers, the Tennessee Valley Authority and the State of Alabama regarding the May 13, 1981 application of the Lawrence County Commission for a permit under the Clean Water Act to construct the proposed nine floodwater retarding structures, including Site No. 4, contemplated by the Big Nance Creek Watershed Project, as modified by reason of environmental concerns. After making no effort whatever to meaningfully participate in these described environment studies and environmental assessments of the Watershed Project in question or in the environmental findings and decisions made in connection therewith, plaintiffs now seek to have the SCS determination and Finding of No Significant Impact vacated on the basis of their late hour opposition to proposed floodwater retarding structure Site No. 4. The only expert testimony offered by plaintiffs to support their contention that SCS's failure to prepare an EIS violates NEPA is that of Dr. Frank B. Tatom, whose first two factual conclusions have been considered and rejected by this Court in Finding of Fact # 37, ante. His third expressed opinion that an EIS should have been prepared because of existing controversy concerning

---

5. 16 U.S.C. § 1003 reads in pertinent part: "In order to assist local organizations in preparing and carrying out plans for works of improvement, the Secretary is authorized .... (1) to conduct such investigations and surveys as may be necessary to prepare plans for works of improvement; (2) to prepare plans and estimates required for adequate engineering evaluation; (3) *to make allocation of costs to the various purposes to show the basis of such allocations and to determine whether benefits exceed costs.*"

16 U.S.C. § 1005 reads in pertinent part: "At such time as the Secretary and the interested local organization have agreed on a plan for works of improvement, *and the Secretary has determined that the benefits exceed the costs,* and the local organization has met the requirements for participation in carrying out the works of improvement as set forth in section 4 (16 U.S.C. § 1004), the local organization may secure engineering and other services, including the design, preparation of contracts and specifications, awarding of contracts, and supervision of construction in connection with such works of improvement...."

the Project is unsupported both by the facts and the law.

The teaching of *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978), is that the factual correctness *vel non* of the SCS decision not to prepare an EIS must be judged by the information available to SCS at the time the decision not to prepare an EIS decision was made. Dr. Tatom's expressed opinion that an environmental impact statement with respect to the Big Nance Creek Watershed Project should have been made by SCS because of the controversy regarding the Project necessarily assumes that the Project was controversial prior to the making of the decision by SCS not to prepare an environmental impact statement, that such controversy was known by SCS, and that the SCS decision was made notwithstanding. There is simply no evidence in this record to support such an assumption.

Secondly, the law of this circuit is that the standard for review of an agency determination that an Environmental Impact Statement need not be prepared is whether such determination is reasonable. This standard was set forth by the former Fifth Circuit in *Sierra Club v. Hassell*, 636 F.2d 1095 (5th Cir., Unit B, Feb. 1981); *Save The Bay, Inc. v. U.S. Corps of Engineers*, 610 F.2d 322 (5th Cir.1980); and *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973).[6] Thus, if the determination is reasonable and made objectively and in good faith on a reviewable environmental record, the determination must be upheld. The federal defendant has presented to this Court the environmental record on which its decision not to issue an EIS was made

which is condensed and summarized as Findings of Fact # 15–22, inclusive, supra. This environmental record is completely adequate for the purpose of the mandated review and determination.

NEPA requires federal agencies to prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An impact statement is not required for a non-major action or a major action which does not have a significant impact on the environment. *Sierra Club v. Hassell, supra,* at p. 1097.

Here the SCS determined and found, after a multi-agency team of biologists evaluated the Watershed Project and determined that adverse impacts could be avoided by eliminating all remaining channel work and modifying the design of the floodwater retarding structures, that the proposed modified measures contemplated by the Project would not cause significant adverse local, regional or national impacts on the environment. This SCS Finding of No Significant Impact is expressly authorized and permitted by the NEPA implementing regulations (40 C.F.R. § 1508.13)[7] and by the SCS implementing regulations adopted to implement the provisions of NEPA (C.F.R. § 650.4).[8]

The National Environment Policy Act of 1969 requires that federal agencies consult with other agencies whose area of expertise is superior to their own. 40 C.F.R. § 1501.6. The record before the Court establishes without dispute that SCS faithfully adhered to this mandate with respect to its NEPA compliance procedures involving

6. In *Bonner v. City of Pritchard,* 661 F.2d 1206 (11th Cir.1981) (en banc) the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

7. 40 C.F.R. § 1508.13 reads: "Finding of No Significant Impact" means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.- 4), will not have a significant effect on the human environment and for which an environ-

mental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

8. 7 C.F.R. § 650.4, Definition of Terms, defines Finding of No Significant Impact in words identical to 40 C.F.R. § 1508.13.

the Big Nance Creek Watershed Project. The record reveals extensive federal and state interagency study, on-site inspections and discussion of the proposed works of improvement of the Watershed Project and a careful study and consideration of alternatives which would minimize environmental concerns before SCS made its independent decision not to prepare an EIS for the Project, as modified by the SCS selection of Alternative No. 4 which provided for the elimination of all remaining channel work and modifications to the design of the proposed floodwater retarding structures. The record further shows without contradiction that SCS made diligent effort to appropriately involve the affected public, including the plaintiffs in this litigation, throughout its NEPA decisionmaking process involving the Watershed Project here involved in full conformity with NEPA requirements.

This Court can only conclude from the evidence in the record that the plaintiffs in this action are now opposed to proposed floodwater retarding structure Site No. 4 for economic and perhaps social or philosophical reasons. Plaintiff Glen C. Mardis in his testimony waxed eloquently regarding his philosophical opposition to government extravagance, citing the Big Nance Creek Watershed Project as an example. While plaintiffs are undoubtedly entitled to oppose the construction of proposed floodwater retarding structure Site No. 4 for economic and social reasons, such reasons by themselves do not require the preparation of an EIS, *Goodman Group Inc. v. Dishroom*, 679 F.2d 182, 185 (9th Cir.1982), citing 40 C.F.R. § 1508.14 (1981).[9]

After careful consideration of the environmental record here and all other evidence presented, this Court finds and holds that the environmental assessment prepared by SCS with respect to this Watershed Project completely and fully addressed the possible environmental consequences, that the assessment was based on substantial

evidence, that SCS complied with appropriate federal statutes and regulations, and that the determination of SCS not to prepare an Environmental Impact Statement for the Big Nance Creek Watershed Project, as modified during its NEPA decisionmaking process, was and is reasonable. Therefore, judgment for the federal and state defendants must be entered on the NEPA issue.

## COST–BENEFIT–RATIO ISSUE

■ Plaintiffs in this action also assert that they are entitled to injunctive relief restraining the construction of proposed floodwater retarding structure Site No. 4 because of SCS's alleged failure to comply with the cost-benefit provisions of the Watershed Protection and Flood Prevention Act, as amended, 16 U.S.C. § 1001 *et seq.*, namely §§ 1003 and 1005 thereof, which require that a determination be made by the Secretary of Agriculture that the benefits of a [watershed] project exceed the costs before federal funds can be expended on the planned works of improvement of such project. Specifically, plaintiffs contend that the original 1962 computation of the cost-benefit ratio ("CBR") made by SCS for the BNCWP (1.3 to 1, Finding of Fact # 7) is out of date, that its use by SCS for the Watershed Project at the present time is thus prohibited, that the updated 1980 CBR computed by SCS for the project as a whole (1.2 to 1, using the pre-1969 interest rate of 3¼ percent, Finding of Fact # 17) is unlawful because SCS did not use a realistic current interest rate in its 1980 CBR procedures, and that if the BNCWP had been evaluated under the 7⅛ percent rate required by law in 1980 the costs of this project would have exceeded the benefits. In addition, plaintiffs challenge SCS's alleged use of outdated ascribed values to various costs and benefits of the project in its 1980 CBR computations.

The Water Resources Development Act of 1974 ("WRDA"), 42 U.S.C. § 1962d–17(a)

---

**9.** 40 C.F.R. § 1508.14 states that "economic or social effects are not intended by themselves to require preparation of an [EIS]" but that such

matters if related to project impacts may be addressed where an EIS is otherwise prepared.

specifies the interest rate to be used in the computation of benefits and costs for watershed projects such as the BNCWP. The latest published rate in 1980 was 7⅛ percent, 18 C.F.R. § 704.39, but SCS in 1980 used the much lower rate of 3¼ percent for the BNCWP by claiming coverage under a "grandfather clause" exemption contained in § 1962d–17(b). That subsection allows the use of the lower interest rate for any [watershed] project authorized before January 3, 1969, "if the appropriate non-federal interests have, prior to December 31, 1969, given satisfactory assurances to pay the required non-federal share of project costs ...." The BNCWP was admittedly authorized well before January 3, 1969. Thus, it was proper for SCS to use the lower interest rate in 1980 if the local sponsors of the project gave "satisfactory assurances" to SCS of their obligations to pay the non-federal share of the project costs.

It is important at the outset of the discussion of the issues here raised to note that plaintiffs are challenging the validity and accuracy of a 1980 CBR computed by SCS pursuant to 16 U.S.C. § 1001 *et seq.* and the directives of 42 U.S.C. §§ 1962d–17(a) and (b) and not under NEPA. The 1980 cost-benefit procedures and data here challenged have never been contained in an EIS because SCS did not prepare an EIS for the Big Nance Creek Watershed Project, an environmental determination which this Court has held to be reasonable, *ante*. Thus, plaintiffs cannot challenge the 1980 CBR in question under the National Environmental Policy Act which requires a more comprehensive and persuasive weighing of costs and benefits than 16 U.S.C. § 1001 *et seq.* contemplates. *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123 (5th Cir.1974) (EDF I). EDF I recognized a limited right of judicial review of CBR computations under NEPA and left open the question whether the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (APA), might create a right of review of CBRs computed under various other statutes and regulations. *See also Sierra Club v. Callaway*, 499 F.2d 982, 991–92 (5th Cir.1974). The former Fifth

Circuit also addressed the question whether APA might create a right of judicial review of CBRs computed under statutes and regulations other than NEPA in *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 1000–1001 (5th Cir., Unit A, July 1981) (EDF IV) but left open the question. Thus *EDF IV* stands only for the proposition that there may or may not be such a right and the Eleventh Circuit has apparently not addressed the issue. This Court has not found any decision which holds there is such a right. To the contrary, all of the cases which have considered the issue—with the exception of *EDF IV*—have refused to review CBRs not contained in an EIS. *See Izaak Walton League of America v. Marsh*, 655 F.2d 346 (D.C.Cir.1981).

It is clear that Congress approved the Big Nance Creek Watershed Work Plan and the 1962 CBR therein contained. Under all of the authorities, therefore, review of that data is foreclosed. Both *EDF I* and *EDF IV* recognize the rule that Congressional action based upon a specific CBR forecloses judicial review of that CBR. *EDF I*, 492 F.2d at 1138–41; *EDF IV*, 651 F.2d at 1006.

This Court is not aware of any federal statute or regulation which required the federal defendant to update the CBR for this Congressionally-approved Watershed Project unless such update requirement can reasonably be implied by the language of 16 U.S.C. § 1005. There is no evidence in this record that the 1980 up-dated cost-benefit analysis has ever been considered by SCS in deciding to continue with the project. This situation is therefore dissimilar to that presented in *EDF IV* in which the former Fifth Circuit found that the Corps of Engineers was required by its internal regulations to revise annually all changes in costs for each of its projects, even those which had been approved by Congress. 651 F.2d at 1003–1004, n. 26. The fact that the Corps of Engineers required itself to update annually its cost-benefit ratios, and to defer consideration of marginally cost-effective projects was cru-

cial to the former Fifth Circuit's holding that the Corps annually updated cost-benefit ratios *not submitted to Congress* were subject to judicial review. That fact is not present in this case. Therefore this Court is convinced that it does not have jurisdiction to review either the original 1962 cost-benefit analysis prepared for the BNCWP (and presumably approved by Congress) or the 1980 CBR update of the project as a whole. Nevertheless, in the interest of finality, this Court will assume it has jurisdiction and address other issues presented.

### [Plaintiffs' Standing to Raise Issues]

■ There is also the question of the plaintiffs' standing to challenge the 1980 updated CBR for the BNCWP. Because neither the Watershed Protection and Flood Prevention Act, as amended, 16 U.S.C. § 1001, *et seq.* or the Water Resources Development Act of 1974, 42 U.S.C. § 1962d–17, establishes the specific right to judicial review of an agency action, the plaintiffs must establish standing under the general provisions of the APA, 5 U.S.C. § 702. For that purpose, the plaintiffs must allege some "injury in fact," and that the injury is "arguably within the zone of interests to be protected or regulated by the statutes that the agencies [are] claimed to have violated." *EDF IV,* 651 F.2d at 1003. *EDF IV* notes that the Supreme Court has indicated that courts should not be austere in granting standing under the APA to challenge agency action taken pursuant to a statute. *Id.* at 1003. Moreover, plaintiffs must allege and prove that the injury they have sustained is traceable to the agency action they seek to have reviewed by the court. *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972).

The starting point in the analysis is to focus on the specific injury alleged to have been sustained by plaintiffs. The amended complaint is stated in several counts. Count Four merely alleges that there has been no cost-benefit analysis prepared for the project or in the alternative that the cost-benefit analysis is not current and not computed in accordance with applicable law. This count does not allege that plaintiffs have been injured in any way. The preface to the amended complaint does contain an allegation that if Site No. 4 of the BNCWP is constructed "its effects will do irreparable harm to plaintiffs...." (Amended Complaint ¶ 3). The amended complaint does not allege any specific injury to plaintiffs as a result of SCS's alleged failure to prepare cost-benefit analysis in accordance with the law. It is inconceivable that any injury to these plaintiffs could be traceable to the use by the Secretary in 1980 of the 3¼ percent interest rate in the 1980 CBR computation for the project as a whole even if the use of that lower interest rate was not warranted. It is therefore not surprising that no proof was adduced on that point. Plaintiffs may possibly sustain some "injury" if Site No. 4 is constructed,[10] although based on the evidence in this record it is extremely doubtful. If plaintiffs do in fact sustain some injury, such injury is not, as a matter of law, traceable to the Secretary's alleged failure in 1980 to properly compute the costs and benefits of the BNCWP as a whole. While economic injury created as an indirect consequence of agency actions can serve as the required "injury in fact," *see Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 151–153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), it is much more likely that the so-called "injury" to plaintiffs in this litigation is not caused by the SCS's 1980 use of

---

**10.** In separate counts based on state law, plaintiffs claim that they were generally opposed to the proposed Site No. 4 floodwater retarding structure, that they were each told that they were the only landowners whose lands were necessary to the construction of the proposed dam (Site No. 4) who had not granted easements to have a portion of their lands flooded and that they each relied upon these representa-

tions by executing easements to the Big Nance Creek Water Management District. In these counts grounded solely on state law of fraud, plaintiffs sought to have this court declare that the easements were void. For reasons dictated into the record the court refused to adjudicate these state law claims and entered orders of dismissal with respect to such non-federal claims.

the lower interest rate under § 1962d–17(b) or of SCS's alleged use of out-dated ascribed values, but by Congress's decision to authorize the construction of the BNCWP. See the discussion in *EDF IV*, 651 F.2d 983 at 1003. The plaintiffs here have not shown or made any effort to show that SCS's 1980 CBR use of the lower interest rate under § 1962d–17(b) can have a broad and direct impact upon the way the SCS treats the BNCWP and, ultimately, upon the way the SCS recommends further construction of the planned works of improvement or not. This Court observes that the present record does not convince the Court that there is a significant possibility that the CBR for the BNCWP would drop below the level of economic justification if SCS were required to use the higher 7⅛ percent interest rate mandated in 1980 by § 1962d–17(a) if the provisions of § 1962d–17(b) did not apply. This Court thus holds that the plaintiffs cannot be said to sustain some "injury in fact" from the SCS's internal 1980 use of a CBR that is alleged to be computed in violation of § 1962d–17(b).

Despite the above holding, this Court will proceed with its analysis of the particular issues here presented upon the assumption that plaintiffs have satisfied the first prong of the standing test of sustaining "injury in fact" by reason of the alleged illegal CBR actions of the SCS. And on that assumption, the Court now addresses the second element of standing under the APA.

After careful consideration, the Court finds that the alleged economic injury to plaintiffs is arguably within the zone of interests to be protected by the relevant statutes, 16 U.S.C. § 1001, *et seq.,* and 42 U.S.C. § 1962d–17(a). The language of the Watershed Protection and Flood Prevention Act, as amended, as well as the language of the Water Resources Development Act of 1974 furnishes persuasive indication that Congress intends federal watershed projects to be governed in part by considerations of local economic development, such as the economic well-being of the people and businesses within the watershed area to be served. Congress has also explicitly recognized that accurate cost-ben-

efit analysis is an important element of that objective. Assuming then, arguendo, that plaintiffs have satisfied the first prong of the standing test of sustaining "injury in fact," the plaintiffs thus have standing to challenge the SCS's 1980 compliance with § 1962d–17. *Accord, Concerned Citizens of Buck Hill Falls v. Grant,* 537 F.2d 29 (3rd Cir.1976).

*Compliance with 42 U.S.C. § 1962d–17(b)*

■ Proceeding now, again arguendo, with the premise that plaintiffs have standing to challenge the action of SCS in admittedly using the lower 3¼ percent interest rate in its 1980 CBR computation for the BNCWP as a whole, the Court notes that on January 28, 1969 SCS issued Watersheds Memorandum 92 which provided instructions for determining discount rates for federal and federally-assisted water resources projects (Finding of Fact # 17). In pertinent part, the Memorandum directed that watershed projects authorized for construction prior to the close of the second session of Congress (October 14, 1968) for which sponsors had—prior to December 31, 1969—given satisfactory assurances to pay the non-federal share of project costs could use a discount rate of 3¼ percent in amortizing costs and benefits. The Memorandum stated that *"[s]ponsors are considered to have provided satisfactory assurances to pay the non-federal share project costs when they sign the work plan agreement."* It can be plausibly argued that the emphasized language of this Memorandum was grounded and formulated on the insistance by SCS at the very inception of a watershed project that only qualified sponsors who were legally and factually able to give satisfactory assurances to SCS to pay their non-federal share of project costs would be permitted by SCS to serve as local sponsors.

SCS National Economics Bulletin No. 39–9–4, December 5, 1970, stated that the interest rate of 3¼ percent should be used for plans approved prior to October 14, 1969 and that "[t]he approval date to be used in determining the applicable interest

rate is the date the administrator or the State Conservationist signed the original plan of agreement."

This SCS policy is consistent with Section 80(b) of the Water Resources Development Act of 1974, Pub.L. 93–251 (March 7, 1974) (WRDA) now codified as 42 U.S.C. § 1962d–17(b):

In the case of any project authorized before January 3, 1969, if the appropriate non-Federal interests have, prior to December 31, 1969, given satisfactory assurances to pay the required non-Federal share of project costs, the discount rate to be used in the computation of benefits and costs for such project shall be the rate in effect immediately prior to December 24, 1968, and that rate shall continue to be used for such project until construction has been completed, unless otherwise provided by a statute enacted after March 7, 1974.

The legislative purpose of section 80(b) of the WRDA was discussed in the recent case of *Johnston v. Davis*, 698 F.2d 1088 (10th Cir.1983). There the court stated, *id.* at 1092:

Section 80(b) recognizes that prior to the passage of WRDA, federal agencies applied an unrealistically low discount rate to water projects. The provision permits continued use of this low discount factor for certain projects commenced prior to the passage of WRDA. The apparent purpose of this provision is to permit continued construction of qualifying projects planned and authorized before the enactment of WRDA, notwithstanding the economic inefficiency that the projects exhibit when evaluated under a realistic discount rate. Section 80(b) represents a legislative judgment that water projects authorized under the past practice of using low discount rates should not be jeopardized by the new policy of applying a more realistic discounting formula.

Assuming that the 1980 SCS decision in question to use the 3¼ percent interest rate is subject to judicial review and assuming that plaintiffs here have standing to challenge that decision, it seems clear that 5 U.S.C. § 706(2)(A) [11] provides the standard of review. As explicated by the Supreme Court in *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971):

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." ... To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. (Citations omitted).

*Accord, Johnston v. Davis, supra.*

We ... conclude that the agency's determination of "satisfactory assurances" should be reviewed under the "abuse of discretion" standard provided in section 10(e)(2)(A) of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

The task of determining whether SCS received timely satisfactory assurances from the local sponsors of the BNCWP prior to December 31, 1969 would be easier if SCS had promulgated regulations appropriately confirming its discretion. *See EDF IV, supra,* 651 F.2d at 1002, 1004 n. 25, (applying agency regulations to evaluate satisfactory assurances). The plaintiffs have not offered the Court a list of the statutes and regulations that they rely

---

**11.** 5 U.S.C. § 706(2)(A) states:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

upon in this particular issue. Neither has the federal defendant other than the two SCS Memorandums above referred to and "Policies, Standards, and Procedures in the Formulation, Evaluation, and Review of Plans for Use and Development of Water and Related Land Resources," Sen.Doc. No. 97, 87th Cong.2d Sess. (1962) (Department of Agriculture Exhibit # 16) often referred to in the testimony of the SCS economist during the bench hearing of this case.

The independent research of this Court has uncovered no SCS or other applicable federal regulations appropriately regulating or confirming SCS's discretion in its determination of the adequacy of satisfactory assurances from local sponsors of watershed projects except as hereinafter stated. 7 C.F.R. § 651.2 does define a sponsor as "an agency or organization *with authority* to provide local responsibility for a federal financially assisted local project under a program administered by SCS." 7 C.F.R. § 662.10(a) further defines a sponsor in the following language: "Watershed projects are sponsored by one or more local organizations qualifying as sponsors as defined in § 620.2 of this chapter. Sponsors must, severally or collectively, have the power of eminent domain so they may acquire land and water rights needed for the project, and have authority to levy taxes or have other adequate means of financing their share of the cost of the project...". 7 C.F.R. § 620.2 defines sponsors or sponsoring local organizations as: "Any of the following who sponsor a watershed project: A state, political subdivision thereof, soil or water conservation district, flood prevention or control district, or combination thereof, or any other agency having authority under state law to carry out, maintain and operate works of improvement: ..."

Testing the qualifications of the local sponsors of the BNCWP from the standpoint of applicable Alabama law, it is clear that they collectively from the outset possessed all of the requisite right, power and authority to finance and otherwise make provision for their share of the cost of such project. The Lawrence County Commission is the governing body of Lawrence County, a political subdivision of the State of Alabama. The Town Councils of the Towns of Moulton and Courtland are the governing bodies of these Alabama municipalities. The Big Nance Creek Watershed Conservancy District and its November 1, 1969 successor, the Big Nance Creek Water Management District, were formed under duly enacted Alabama statutes to participate and serve as local sponsors of watershed projects and each possessed the right of eminent domain and the type of right of eminent domain needed by local sponsors of watershed projects and in particular by the BNCWP. The Lawrence County Soil and Conservation District was incorporated under long-standing Alabama law (now codified as 9–8–20 *et seq. Code of Alabama* 1975) and is expressly authorized to provide a substantial portion of the obligations of the local sponsors of the BNCWP under the Watershed Work Plan Agreement.

As noted above, SCS, as early as 1969, considered that sponsors had given "satisfactory assurances" to bear their share of the project costs when they signed a watershed work plan agreement. The SCS Watershed Staff Leader testified that before the State Conservationist indicates his acceptance of any watershed work plan agreement by signing it, several determinations are made: Do the sponsors either collectively or individually have the authority and the ability to carry out their obligations under the Watershed Work Plan Agreement? Does one or more of the sponsors have the power to tax? The power of eminent domain? Are the sponsors apparently willing to sign the agreement? Considering the nature of the sponsors of this project and the none too onerous obligations they accepted by signing the watershed work plan agreement, the SCS equation of "satisfactory assurances" with the sponsors' signing of the watershed work plan agreement cannot be said to be unreasonable.

The precise question presented and remaining to be answered, still assuming but

not conceding plaintiffs' right of standing to challenge SCS's compliance with § 1962d–17, is did the SCS clearly abuse its discretion in accepting the original Watershed Work Plan Agreement and thereby determining that the local sponsors had given "satisfactory assurances" to bear their non-federal share of the costs of the BNCWP? This Court on the basis of the record and applicable law finds no abuse of discretion in that decision. To the contrary, the decision was fully justified and reasonable. This Court therefore holds that SCS was legally entitled to use a 3¼ percent discount rate in amortizing the projected costs and benefits of the watershed project in its 1980 CBR computation. Direct support for this holding is found in the recent case of *Johnston v. Davis*, 698 F.2d 1088 (10th Cir.1983).

The cases of *State Ex Rel. Baxley v. Corps of Engineers*, 411 F.Supp. 1261 (N.D.Ala.1976), and *Burkey v. Ellis*, 483 F.Supp. 897 (N.D.Ala.,1979), have been fully and carefully considered by the Court in the rendition of the within opinion. This Court has applied an objective standard in testing the "satisfactory assurances" issue here involved, thus comporting with *Baxley* but finds itself in disagreement with the *Burkey* court in that portion of its opinion holding that SCS is no longer included under Section 80(b) of the Water Resources Development Act of 1974 by the enactment on May 13, 1977 of P.L. 95–28. In the opinion of this Court, Section 80(b) was not repealed by implication by the enactment of P.L. 95–28. See footnote 6 of 698 F.2d 1088, 1094 (10th Cir.1983).

Plaintiffs' prayer for injunctive relief is therefore denied, their complaint (as amended) dismissed with prejudice and judgment will be entered in favor of the federal and state defendants.

Judgment shall be entered in accord with this opinion by separate order.